[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
Nov. 3, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-16928

_____

D. C. Docket No. 07-20778-CR-JEM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

PETERSON JEAN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(November 3, 2009)

Before CARNES and HULL, Circuit Judges, and GOLDBERG,* Judge.

PER CURIAM:

_____

*Honorable Richard W. Goldberg, Judge, United States Court of International Trade,
sitting by designation.

Peterson Jean appeals the 188-month sentence imposed on him after he pleaded guilty to: (1) conspiracy to distribute and to possess with intent to distribute five grams or more of crack cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(B); and (2) possession with intent to distribute five or more grams of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). Jean contends that his sentence, which was at the low end of the advisory guidelines range, is unreasonable.

## I.

## A.

In May 2007 the Drug Enforcement Administration, the North Miami Beach Police Department, and the North Miami Police Department with the help of a confidential source teamed up to investigate the distribution of crack cocaine in an area of North Miami. On May 14 the source called Alexander Robiou, one of Peterson Jean's co-defeants, and ordered $200 worth of crack cocaine. That same day Robiou met the source near a dumpster in North Miami and sold him what turned out to be 2.4 grams of crack cocaine for $200. Eleven days later the source called Robiou again. Proving that variety is not necessarily the spice of the drug trade, the source arranged to meet Robiou at the same location to buy another $200 worth of crack cocaine. The second drug buy went off without a hitch; the

2

source gave Robiou $200 for what this time turned out to be 2.1 grams of crack cocaine.

By May 31 law enforcement and the source were ready to change things up—as apparently was Robiou. On that date, the source called Robiou and asked to buy $650 worth of crack cocaine. Robiou agreed but sent Widney Joseph, another one of Jean's co-defendants, to deliver the drugs. Joseph gave the source 6.5 grams of crack cocaine in return for the agreed upon $650. On June 21 the source called Robiou one last time asking to buy another $650 worth of crack cocaine. Not one to refuse, Robiou agreed. This time Robiou sent Peterson Jean (aka "Petey") to deliver the drugs. Jean met the source and gave him what turned out to be 8.6 grams of crack cocaine for the $650.

Unfortunately for Jean, his meeting with the source was not a private affair. The drug sale was being recorded on video by an aerial surveillance unit, and the source was wearing an audio recording device. Based on that drug sale, Jean was indicted for one count of conspiring to possess with intent to distribute five grams or more of crack cocaine and one count of possessing five grams or more of crack cocaine with intent to distribute. He later pleaded guilty to both counts without a plea agreement.

3

This was not Jean's first encounter with law enforcement. His extensive criminal history is recounted in his presentence investigation report. Jean's first documented incident of criminal behavior occurred in April 2000 when, at age 15, he broke into a building. He was charged with burglary of an unoccupied structure and criminal mischief. The criminal mischief count was abandoned, and he was placed on community control for 2 years for the burglary count.

His second incident occurred six months later. In October 2000 Jean was charged with one count of loitering or prowling, but the charge was nolle prossed. The third criminal incident occurred almost exactly one year later. In October 2001 Jean, now age 17, stole a car and went joyriding with a friend through the streets of Miami before being stopped by law enforcement. This time he was charged with grand theft of a vehicle and burglary of an unoccupied conveyance.

Incident four occurred the following month. In November 2001 Jean was arrested and charged with grand theft of a vehicle, burglary of an unoccupied conveyance, and criminal mischief after he was seen driving another stolen vehicle. All three charges were nolle prossed.

Incident five occurred in January 2002. Getting what would have been the deal of the century, Jean bought a vehicle from a crack user named Charles for $5.

Unsurprisingly, the vehicle turned out to be stolen, and Jean was arrested and charged with grand theft of a vehicle and possession of burglary tools. In April 2002 he was adjudicated delinquent on both counts, in addition to the October 2001 counts, and was committed to the Department of Juvenile Justice.

Jean's sixth incident occurred in February 2004. By this time, he had graduated from theft into drug crimes. Jean, now age 19, was arrested and charged with one count of possession of cocaine, one count of possession of marijuana, and one count of resisting an officer without violence. Adjudication was withheld on the drug offenses, and he received 18 months probation for them. He received a suspended sentence on the resisting an officer charge.

Incidents seven and eight occurred in May and June of 2004. Both involved Jean's driving without a license. The charge stemming from the May incident was nolle prossed, but he was fined $180 on the one resulting from the June incident.[2]

In October 2005 incident nine occurred: law enforcement officers saw Jean sell crack cocaine on the street. When the officers approached him and identified themselves, Jean ran. Eventually he was arrested and charged with one count of possessing crack cocaine with intent to distribute and one count of resisting an

---

[2]On six other occasions, Jean was charged with either driving without a license or with a suspended license. Because those charges were not pursued, we are omitting them from our discussion to avoid unduly lengthening the opinion. On a separate occasion, Jean was arrested for driving without a license and was fined $150.50.

5

officer without violence.[3] Jean was arrested again only three months later in January 2006 when he sold $20 worth of crack cocaine to an undercover officer.[4] This time he was charged with one count of possession with intent to distribute. In February 2006 he was convicted on all three counts and sentenced to 90 days in jail but was released after serving only one month.[5]

As our discussion shows, by the time Jean sold crack cocaine to the confidential source in this case in June of 2007, he was no stranger to law enforcement. Fate had smiled on him up to that point. Despite his numerous run-ins with law enforcement, the longest sentence Jean had received was the 90 days in jail he had gotten for his October 2005 and January 2006 drug offenses, and he had been required to serve only one-third of that short sentence.

## C.

At sentencing for the June 21 crack cocaine sale to the confidential source, the district court adopted, without objection, the information in Jean's PSI.[6]

---

[3]Law enforcement retrieved 2.5 grams of crack cocaine.

[4]The crack cocaine weighed approximately .2 grams.

[5]Jean received two concurrent sentences of 90 days in jail for the October 2005 and January 2006 offenses. In between those drug offenses, Jean was also arrested in December 2005 for driving a car with an unlawful temporary tag. Adjudication was withheld, and he was fined $344.

[6]The guidelines calculations in his PSI were adopted by the district court (and without objection), except that the court did reduce the total offense level recommended in the PSI, giving Jean a reduction for acceptance of responsibility after he submitted a letter to the court

6

The PSI calculated his base level offense at 24 because he was accountable for selling 8.6 grams of crack cocaine. See U.S.S.G. § 2D1.1(a)(3). Jean's October 2005 and January 2006 convictions for selling crack cocaine qualified him as a career offender under § 4B1.1(a).[7] Because the statutory maximum for his offenses was 40 years imprisonment, see 21 U.S.C. § 841(b)(1)(B), section 4B1.1(b) increased his offense level to 34. See U.S.S.G. § 4B1.1(b)(B). Jean was given a three-level downward adjustment based on acceptance of responsibility, reducing his offense level to 31.

As for his criminal history category, Jean had a total of 7 points, which would place him in a criminal history category of IV. See U.S.S.G. Ch. 5 Pt. A. Because he qualified as a career offender under § 4B1.1, however, he got a criminal history category of VI. See U.S.S.G. § 4B1.1(b) ("A career offender's criminal history category in every case . . . shall be Category VI."). With a criminal history category of VI and an offense level of 31, Jean's advisory

---

that it believed justified that reduction.

[7]Under the sentencing guidelines, "a defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is . . . a controlled substance offense; and (3) the defendant has at least two prior felony convictions of . . . a controlled substance offense." U.S.S.G. § 4B1.1(a). Jean qualified as a career offender because he was 22 on June 21, 2007, the date he sold 8.6 grams of crack cocaine to the confidential source. That offense was a felony and a controlled substance offense. See U.S.S.G. § 4B1.2(b). And, his October 2005 and January 2006 convictions for selling crack cocaine constituted "two prior felony convictions of . . . a controlled substance offense."

guidelines range was 188 to 235 months imprisonment.  See U.S.S.G. Ch. 5 Pt. A.

After discussing Jean's guidelines range, the district court listened to arguments from both sides.  The government argued that Jean should be sentenced at the bottom of the guidelines range to about 188 months in jail.  In response, Jean contended that 188 months imprisonment would be an unreasonable sentence.  First, he argued that if he had been convicted of selling powder cocaine, instead of crack cocaine, he would be facing a shorter sentence.  Second, Jean argued that he should not be sentenced as a career offender.  He admitted that he fit within the guidelines definition but argued that the designation was undeserved.[8]  He pointed out that the two offenses that qualified him for career offender status—his October 2005 and January 2006 drug convictions—were only three months apart.  If fate had continued to smile on him and law enforcement had arrested him only once, he would not qualify as a career offender because he would have only one earlier drug conviction, not the required two, and his guidelines range would be 57 to 71 months.[9]

---

[8]Interestingly, when asked by his probation officer about his employment, Jean responded that he had been self-employed "making money on the streets" since 2000.  The district court appears to have drawn the obvious conclusion about how Jean had been making money on the streets, stating at sentencing that "the way that he chose to support his family is terribly wrong."

[9]That "if only" guidelines range of 57 to 71 months would have been the product of a total offense level of 21 and a criminal history category of IV.

Third, Jean asserted that a sentence of 188 months imprisonment was unduly harsh given the sentences imposed on his equally or more culpable co-defendants, Robiou and Joseph. Robiou, who arranged the drug sales to the confidential source, was sentenced to 120 months imprisonment.[10] Joseph, who sold the confidential source 6.5 grams of crack cocaine on one occasion, was sentenced to 151 months imprisonment.[11] Jean argued that sentencing him to 188 months imprisonment, a longer sentence than either of his co-defendants had received, would create an unwarranted sentencing disparity.

In response to Jean's sentencing disparity argument, the government said: "Your Honor, I just want to point out, I think you're aware that the history and the convictions that this defendant has that make him a career offender are exactly

---

[10]Robiou pleaded guilty to two counts of possessing with intent to distribute a detectable amount of crack cocaine (counts 1, 2), in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), one count of conspiring to possess with intent to distribute a detectable amount of crack cocaine (count 3), in violation of §§ 846, 841(a)(1), and 841(b)(1)(C), and one count of conspiring to possess with intent to distribute five grams or more of crack cocaine (count 5), in violation of §§ 846, 841(a)(1), and 841(b)(1)(B). When the dust settled at his sentencing, Robiou's advisory guidelines range was 57–71 months imprisonment. He was sentenced to 57 months for three counts and 120 months for another count, the sentences to run concurrently. The government dismissed two additional counts against Robiou as part of a plea agreement: one count of possessing with an intent to distribute a detectable amount of crack cocaine (count 4), in violation of §§ 841(a)(1) and 841(b)(1)(C), and one count of possessing with an intent to distribute five grams or more of crack cocaine, in violation of §§ 841(a)(1), and 841(b)(1)(B). See infra pp. 18–19.

[11]Joseph pleaded guilty to one count of possessing with intent to distribute a detectable amount of crack cocaine (count 4), in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). His total offense level was 29, and he was placed in a criminal history category of VI because he was a career offender, making his advisory guidelines range 151–188 months imprisonment.

what he's charged with today, which are, you know, selling drugs to the community. And that is why he's different than his other codefendants, Mr. Robiou and Mr. Joseph. They were not career offenders and they did not have this history."

The government's statement about Robiou was true. Although he had an earlier state conviction for possessing cocaine with an intent to sell or deliver, he was not a career offender. The government's statement about Joseph was not true. He had, in fact, been sentenced as a career offender. Joseph qualified as a career offender because he had two earlier felony convictions for controlled substances. Those two earlier felony convictions were a third degree felony for possession with intent to sell, manufacture, or deliver marijuana, and a second degree felony for possession with intent to sell, manufacture, or deliver cocaine.

Jean's counsel was apparently unaware that the government's statement was inaccurate as to Joseph, because her response was: "Or they weren't arrested for it." In reply, the district court said:

> Well, but that's part of the problem . . . [The problem] is that unfortunately this is not a victimless crime. This is a crime which victimizes his community. Victimizes the family that he loves and that support him. Victimizes everybody in that neighborhood. Victimizes everybody that he comes in contact with, and that's the sad part is that I don't think he's an evil person. I mean, I certainly sentenced people that are far more evil than Mr. Jean. But what he chose to do and the way that he chose to support his family is terribly

10

wrong. And while I will go along with the minimum, the sentence at the low end of the guidelines, I think that I really feel like I have to go along with the guidelines and I will not be able to go below the guidelines as you requested.

After making that statement, the district court sentenced Jean to two concurrent sentences of 188 months in jail. Jean is now challenging the reasonableness of the district court's sentence.

## II.

"We review sentencing decisions only for abuse of discretion, and we use a two-step process." United States v. Shaw, 560 F.3d 1230, 1237 (11th Cir. 2009). First, we must " 'ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range.' " Id. (quoting Gall v. United States, 552 U.S. 38, __, 128 S. Ct. 586, 597 (2007)). If we find the sentence to be procedurally sound, the second step is to review the "substantive reasonableness" of the sentence, taking into account the totality of the circumstances, "including the extent of any variance from the Guidelines range." Gall, 552 U.S. at __, 128 S. Ct. at 597. If the district court's sentence is within the guidelines range, we expect that the sentence is reasonable.

11

See United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005) ("After Booker, our ordinary expectation [of reasonableness] still has to be measured against the record, and the party who challenges the sentence bears the burden of establishing that the sentence is unreasonable in the light of both that record and the factors in section 3553(a)."); see also United States v. Hunt, 526 F.3d 739, 746 (11th Cir. 2008) ("Although we do not automatically presume a sentence within the guidelines range is reasonable, we 'ordinarily . . . expect a sentence within the Guidelines range to be reasonable.'" (quoting Talley, 431 F.3d at 788)).

When deciding upon a sentence, the district court must evaluate all of the § 3553(a) factors, Gall, 552 U.S. at __, 128 S. Ct. at 596, but it is allowed to attach "great weight" to one factor over others. Id. at 600; Shaw, 560 F.3d at 1237. In evaluating the factors, the district court is "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Gall, 552 U.S. at __, 128 S. Ct. at 598 (internal quotation marks omitted). We give the district court's sentencing decision "due deference," id. at __, 128 S. Ct. at 597, because "[t]he sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case. The judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and

12

gains insight not conveyed by the record." Id. (internal quotation marks omitted). Moreover, district courts have an "institutional advantage" in making sentencing determinations because "they see so many more Guidelines sentences than appellate courts do." Id. at __, 128 S. Ct. at 598 (internal quotation marks omitted).

All the same, we will obey the Supreme Court's instruction that: "In sentencing, as in other areas, district judges at times make mistakes that are substantive. At times, they will impose sentences that are unreasonable. Circuit courts exist to correct such mistakes when they occur." Rita v. United States, 551 U.S. 338, 353, 127 S. Ct. 2456, 2466–67 (2007). This, however, is not one of those cases where a district court has imposed an unreasonable sentence.

### III.

The first review is for procedural error in the sentencing. See Shaw, 560 F.3d at 1237. Jean does not contend that the district court incorrectly calculated the sentencing guidelines or treated them as mandatory. Instead, he contends that the district court did not "properly consider or apply" the § 3553(a) factors and instead erroneously focused on a single factor—his criminal history. We disagree. It is clear from the record that the district court adequately considered the § 3553(a) factors. The court discussed several of them on the record, and before

imposing a sentence it stated that it had "considered the statements of all the parties, the presentence report which contains the advisory guidelines and the statutory factors." The district court's acknowledgment that it had considered Jean's arguments and the § 3553(a) factors "alone is sufficient in post-Booker sentences." United States v. Scott, 426 F.3d 1324, 1330 (11th Cir. 2005).

Jean also asserts that a procedural error occurred because the district court selected a sentence based on clearly erroneous facts. At the sentencing hearing, the government distinguished Jean from his co-defendants, Robiou and Joseph, by representing to the court that they were not career offenders and did not have the same criminal history that he did. The government stated: "They [Robiou and Joseph] were not career offenders and they did not have this history." As we have already discussed, the government's statement was not completely accurate. Robiou did not qualify as a career offender but Joseph did. Jean contends that the government's misstatement influenced the district court's decision not to impose a sentence below the guidelines range. "Regardless of whether the sentence imposed [by the district court] is inside or outside the Guidelines range," we are required to ensure that "the district court committed no significant procedural error, such as . . . selecting a sentence based on clearly erroneous facts." Gall, 552 U.S. at __, 128 S. Ct. at 597. Thus, the fact that Jean's sentence was within the

advisory guidelines does not end the inquiry into whether a procedural error occurred. Although we are troubled by the government's misstatement, Jean has failed to convince us that it had any impact on the sentence selected by the district court.

Jean's counsel responded to the government's misstatement by saying: "Or they weren't arrested for it." In reply, the district court did not indicate that it attached any importance to whether the lighter sentenced co-defendants were career offenders. Instead, the court focused on the consequences to the community of selling drugs and condemned as "terribly wrong" the way Jean had chosen to earn his livelihood. Those were the reasons the court gave to explain why "I think that I really feel like I will have to go along with the guidelines and I will not be able to go below the guidelines as you requested," even though the court had acknowledged that it did have the power to vary downward.

After carefully reviewing the transcript of Jean's sentencing hearing, we are convinced that the government's misstatement did not influence the sentence selected by the district court. The transcript makes clear that the district court's sentence was influenced by Jean's extensive criminal history and the need to impose a sentence that would sufficiently reflect the seriousness of his offenses, not by whether his co-defendants, who had received lighter sentences, were or

15

were not career offenders. Because of that fact this case is distinguishable from United States v. Barner, 572 F.3d 1239, 1250–51 (11th Cir. 2009), where it did appear from the transcript that the sentence had been affected by the government's misstatement.

Because we find that Jean's sentence is "procedurally sound," Shaw, 560 F.3d at 1237, we must decide whether, as he contends, his sentence is substantively unreasonable. He asserts that it is on several grounds. First, Jean argues that the district court attached too much weight to a single § 3553(a) factor—his criminal history. Although the district court emphasized Jean's criminal history, which is only one of the § 3553(a) factors, see 18 U.S.C. § 3553(a)(1), that does not mean that its sentence, which was at the low end of the guidelines range, was unreasonable. See United States v. Williams, 526 F.3d 1312, 1322 (11th Cir. 2008) ("A district court's unjustified reliance on a single § 3553(a) factor may be a 'symptom' of an unreasonable sentence. However, such a sentence is not necessarily unreasonable.") (internal citations omitted). "Indeed, the weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court." Id. (internal quotation marks and alteration omitted).

At Jean's sentencing, in addition to emphasizing his extensive criminal history, the district court discussed several other § 3553(a) factors. Addressing the

16

seriousness of the offense, see 18 U.S.C. § 3553(a)(2)(A), the court stressed the impact that drugs have on a community, pointing out that "this is not a victimless crime. This is a crime which victimizes his community . . . . Victimizes everybody in that neighborhood." Addressing the need to protect the public from further crimes of the defendant, see § 3553(a)(2)(C), the district court explained that: "based on his track record, . . . the only way you're going to keep him from committing crimes to the public is by keeping him away from the public for a long period of time." After his counsel pointed out that the longest sentence Jean had ever received was 90 days in jail, the district court indicated that a lengthy sentence was necessary to deter him from committing future crimes. See § 3553(a)(2)(B) (need to "afford adequate deterrence to criminal conduct"). Because the district court has discretion in deciding how much weight to give each § 3553(a) factor, Williams, 526 F.3d at 1322, and it is apparent the court did not base the sentence solely on one factor, Jean has failed to show that his sentence is substantively unreasonable on that ground.

Jean also argues that his sentence is substantively unreasonable when contrasted with the shorter sentences that his co-defendants Robiou and Joseph received. Robiou, who arranged the drug sales to the confidential source, entered a plea agreement with the government and pleaded guilty to two counts of

17

possessing with intent to distribute a detectable amount of crack cocaine, one count

of conspiring to possess with intent to distribute a detectable amount of crack

cocaine, and one count of conspiracy to possess with an intent to distribute five

grams or more of crack cocaine.  In exchange for his cooperation, the government

agreed to dismiss the remaining charges against him and to make a motion to have

his sentence reduced for providing substantial assistance to the government.

Robiou was sentenced to 120 months imprisonment for the conspiracy conviction

for five grams or more of crack cocaine and three 57-month sentences for the

remaining convictions, to run concurrently, for a total term of imprisonment of 120

months, eight years supervised release, and a special assessment of $400.[12]

Joseph, who sold the confidential source 6.5 grams of crack cocaine, also

---

[12]Robiou's PSI calculated his base level offense at 24.  He was given a three-level downward adjustment based on acceptance of responsibility, reducing his total offense level to 21.  His criminal history placed him in a criminal history category of IV.  With a total offense level of 21 and a criminal history category of IV, Robiou's advisory guidelines range was 57–71 months imprisonment.

Robiou's earlier state court drug conviction, however, made him subject to a statutory mandatory minimum sentence of 120 months imprisonment for the count involving conspiring to possess with intent to distribute five grams or more of crack cocaine.  See 21 U.S.C. §§ 841(b)(1)(B) and 851. Under the sentencing guidelines, when a defendant's advisory guidelines range is below a statutorily required minimum sentence, the statutorily required minimum becomes the defendant's guideline sentence. See U.S.S.G. § 5G1.1(b).  Robiou's guidelines sentence for that count was thus increased to 120 months imprisonment.  Robiou was sentenced to 120 months imprisonment for that count and to three 57-month sentences for the other counts, with the sentences to run concurrently.

18

entered into a plea agreement with the government. He pleaded guilty to one count

of possessing with an intent to distribute a detectable amount of crack cocaine. In

exchange for his guilty plea, the government agreed to dismiss the remaining

charge against him. The district court sentenced Joseph to 151 months

imprisonment, three years supervised release, and a special assessment of $100.[13]

Jean contends that the district court created an unwarranted sentencing disparity

when it sentenced him to 188 months imprisonment.

One of the factors a district court must consider when imposing a sentence is

"the need to avoid unwarranted sentence disparities among defendants with similar

records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

That provision seeks to promote uniformity in the sentences received by similarly

situated defendants. It "does not require that defendants in a single case be

sentenced to identical prison terms. To the contrary, [§ 3553(a)(6)] seeks only to

avoid <u>unwarranted</u> sentencing disparities." United States v. Statham, 581 F.3d

---

[13]Because the statutory maximum for possessing with an intent to distribute a detectable amount of crack cocaine is 20 years imprisonment, see 21 U.S.C. § 841(b)(1)(C), his offense level under § 4B1.1 was 32. He received a three-level downward adjustment based on acceptance of responsibility, reducing his total offense level to 29. He was placed in a criminal history category of VI because he qualified as a career offender. See U.S.S.G. § 4B1.1(b). With a total offense level of 29 and a criminal history category of VI, Joseph's advisory guidelines range was 151–188 months imprisonment. He was sentenced to 151 months imprisonment, the low end of the advisory guidelines range.

548, 556 (7th Cir. 2009) (emphasis added) (internal quotation marks omitted). "[A] defendant is not entitled to a lighter sentence merely because his co-defendants received lighter sentences." United States v. Wallace, 573 F.3d 82, 97 (1st Cir. 2009) (internal quotation marks omitted). And, in any event, the § 3553(a)(6) factor is but one of the seven statutory factors to be considered.

Although Jean was sentenced to a jail term 68 months longer than Robiou and 37 months longer than Joseph, the fact that he received a longer sentence than his co-defendants does not mean that his sentence is unreasonable. The difference in the sentences received by Robiou and Joseph on the one hand, and Jean on the other, was due to a number of factors. Unlike Jean, his two co-defendants entered into plea agreements with the government. They cooperated, and in exchange for their cooperation the government agreed to dismiss some of the charges against them. Robiou did not have the same history of drug convictions that Joseph and Jean did. See United States v. Carson, 560 F.3d 566, 586 (6th Cir. 2009) (explaining that "differences in criminal histories, the offenses of conviction, or one coconspirator's decision to plead guilty and cooperate with the government" can result in legitimate co-defendant disparities) (internal quotation marks omitted). Jean has failed to establish that the discrepancy between the sentence he received and the sentences received by Robiou and Joseph is unwarranted or, even

20

if it were, that the disparity necessarily outweighed the other § 3553(a) factors.

Jean also asserts that his sentence is substantively unreasonable because the district court failed to consider "the vast, and now discredited, disparity between how powder cocaine offenders are treated compared to crack cocaine offenders under the guidelines." As he correctly points out, crack and powder cocaine, although chemically similar, are treated differently for sentencing purposes. See Kimbrough v. United States, 552 U.S. 85, __, 128 S. Ct. 558, 566 (2007). "[A] defendant convicted of an offense involving [crack cocaine] faces a longer possible sentence than a defendant convicted of an offense involving the same amount of powder cocaine . . . ." United States v. Williams, 456 F.3d 1353, 1364 (11th Cir. 2006), abrogated by Kimbrough, 552 U.S. at __, 128 S. Ct. at 575. The Supreme Court held in Kimbrough that is not an abuse of discretion for a district court to consider the crack and powder cocaine disparity when sentencing a defendant. 552 U.S. at __, 128 S. Ct. at 575; see also United States v. Vazquez, 558 F.3d 1224, 1228 (11th Cir. 2009) (observing that Kimbrough allows a sentencing court to "consider the Guidelines' disparate treatment of crack and powder cocaine offenses as part of its consideration of § 3553(a)(6), the need to avoid sentencing disparities.").

Jean argued at sentencing that if he had been convicted of offenses involving

powder cocaine instead of crack cocaine, his advisory guidelines range would have been 151 to 188 months imprisonment — not 188 to 235 months. He urged the district court to impose a more lenient sentence in light of that fact. The district court was required to listen, as it did, to Jean's argument regarding the disparate treatment of crack and powder cocaine, but the court was not required to reduce Jean's sentence because of it. See Kimbrough, 552 U.S. at __, 128 S. Ct. at 575.

In sum, Jean's sentence was procedurally and substantively reasonable.

**AFFIRMED.**[14]

---

[14]This case was originally scheduled for oral argument, but the panel unanimously decided that oral argument was not necessary. See 11th Cir. R. 34-3(f).